# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **LARRY RAY,** | **No. 16 CV 4376** |
| **Plaintiff,** | |
| **v.** | **Magistrate Judge Young B. Kim** |
| **NANCY A. BERRYHILL, Acting Commissioner of Social Security,** [1] | |
| **Defendant.** | **April 19, 2017** |

## MEMORANDUM OPINION and ORDER

Larry Ray seeks disability insurance benefits ("DIB") and supplemental security income ("SSI") based on his claim that he is disabled by chronic pain stemming from a work-related back injury and by symptoms related to his peripheral artery disease. After an Administrative Law Judge ("ALJ") denied his applications for DIB and SSI and the Appeals Council declined review, Ray brought this lawsuit seeking judicial review of the denial. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Ray's motion is denied and the government's is granted:

### Procedural History

Ray filed his DIB and SSI applications in October 2012 claiming a disability onset date of August 11, 2011. (Administrative Record ("A.R.") 200-13.) After his

---

[1]  Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Federal Rule of Civil Procedure 25(d), she is automatically substituted as the named defendant in this case.

claims were denied initially and upon reconsideration, (id. at 90-91, 114-15), Ray sought and was granted a hearing before an ALJ. That hearing took place on August 7, 2014. (Id. at 30-71.) On September 26, 2014, the ALJ issued a decision concluding that Ray is not disabled and therefore not entitled to DIB or SSI. (Id. at 24.) When the Appeals Council declined review, (id. at 1-7), the ALJ's decision became the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Ray filed this lawsuit seeking judicial review of the Commissioner's final decision, *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 10).

## Facts

Ray's disability onset date corresponds with the date of an on-the-job back injury he suffered in August 2011. Ray was working as a housekeeper when he bent over to lift a heavy blower from the floor and felt a sharp pain in his lower back. He asserts that despite time and treatment his back pain persists to an extent that prevents him from working in any capacity. At his August 2014 hearing before the ALJ, Ray submitted both documentary and testimonial evidence in support of his claims.

## A.    Medical Evidence

In the immediate wake of his on-the-job injury, Ray underwent a lumbar-spine MRI that revealed moderate disc degeneration with broad-based disc protrusion and neural foraminal narrowing at L5-S1 and mild disc bulging at L3-4 and L4-5. (A.R. 346.) In the five months following his injury, Ray received

treatment from Dr. Mark Gerber, who prescribed anti-inflammatory and analgesic medications. (Id. 738-43.) Dr. Gerber noted in December 2011 that Ray had moderate end-range pain and restrictions in lumbar extension and that there was evident spasm and inflammation in his lower back. (Id. at 738-39.) Dr. Gerber's goals for Ray were to increase his range of motion and strength, decrease his pain, and restore him to normal function. (Id. at 739.) In furtherance of those goals, Dr. Gerber directed Ray to temporarily refrain from working and prescribed epidural steroid injections and 20 sessions of physical therapy. (Id.) By early January 2012, Dr. Gerber found that "Ray has improved sufficiently that he can be released from care to return to work light duty as of 01/11/12." (Id. at 743.)

Starting before his injury and throughout the period relevant to the current claims, Ray's primary physician was Dr. R. Medavaram, who treated him for a range of medical issues from a cold to big-toe pain. (Id. at 362-63.) The bulk of Dr. Medavaram's handwritten notes are illegible, but those that can be parsed show that in January 2012 Dr. Medavaram noted that Ray was a smoker who needed a cardiac evaluation and referred him in April 2012 to a cardiologist. (Id. at 357-58.) Dr. Medavaram noted in May 2012 that Ray reported that his back pain had improved but then had increased and that his medications were not helping. (Id. at 378.) In response, Dr. Medavaram prescribed him Vicodin. (Id.) That same month a myocardial perfusion imaging test showed normal results with "no scintigraphic evidence of fixed or reversible defects." (Id. at 344.) In July 2012 Dr. Medavaram

described Ray as having stable coronary artery disease and low back pain.  (Id. at 355.)

In September 2012 Dr. Medavaram filled out a medical report regarding Ray's employability.  (Id. at 380-81.)  Dr. Medavaram opined that Ray was disabled by coronary artery disease and low-back pain, resulting in his having only a "partial capacity" to walk, stand, sit, bend, stoop, turn, reach, or engage in finger dexterity, and as having "no capacity" to run, climb, push, or travel.   (Id. at 380.) Dr. Medavaram endorsed the view that Ray was "totally permanently disabled from all forms of employment." (Id. at 381.)

The following month, in October 2012, Ray was admitted to a hospital for five days after he reported to the emergency room with complaints of chest pain and shortness of breath.  (Id. at 390.)  The emergency room notes reflect that Ray had normal range of motion and strength in his musculoskeletal system, and reflect diagnoses of chest pain, diabetes mellitus, and hypertension.  (Id. at 392, 395.)  An EKG test performed during his hospital stay reflected that he has "normal exercise tolerance" and had reached "adequate workload."  (Id. at 387.)  A month after his discharge, Ray underwent an outpatient cardiology follow-up, during which he told his doctor that he was unable to work because of low-back syndrome, not because of cardiac or respiratory issues.  (Id. at 384.)  The notes reflect that he was compliant with his medication and was counseled to quit smoking and to "keep walking and exercising legs as tolerated."  (Id.)  He was diagnosed as having peripheral artery disease.  (Id.)

In December 2012 consulting physician Dr. Reynaldo Gotanco provided opinions regarding Ray's residual functional capacity ("RFC") in connection with the denial of his claims at the initial level of review. (Id. at 72-89.) Dr. Gotanco opined that Ray could sit, stand, or walk for about six hours in an eight-hour day, that he could occasionally lift 20 pounds and frequently lift 10 pounds, that he was unlimited in pushing or pulling, and that he had postural limitations allowing him to climb ramps and stairs, stoop, kneel, crouch, and crawl only frequently, and to climb ladders, ropes, or scaffolds only occasionally. (Id. at 77.) Dr. Gotanco also opined that Ray should avoid concentrated exposure to hazards. (Id. at 78.) He found Ray's statements regarding his symptoms only partially credible because Ray has no problems with personal care and can perform light housework. (Id. at 76.) Dr. Gotanco also found Ray's statement that he could only climb a few stairs unsupported by the medical records. (Id.)

The record reflects that other than one visit to a family practice in March 2013, from November 2012 through September 2013 there is a gap in Ray's medical treatment.[2] (See id. at 422, 723.) In June 2013, however, Ray reported for a consultative examination with Dr. Charles Carlton at the request of the Bureau of Disability Determination Services. (Id. at 429-33.) Ray reported to Dr. Carlton that he stopped having follow-up visits for treatment for his back pain because workers' compensation stopped paying for the visits. (Id. at 430.) He had not had an epidural steroid injection since 2012, but he said the injections only made his pain

---

[2] There is one entry from December 2012 in Dr. Medavaram's notes, but it states, "No visit. Here to discuss his disability." (A.R. 724.)

worse.  (Id.)  Ray reported that he was independent with activities of daily living but could only walk for a quarter of a block before experiencing back pain.  (Id. at 430-31.)  Dr. Carlton examined Ray and noted that he appeared to be in no acute distress and was able to rise from sitting to standing without help, but that he walked with a slow and rigid gait and complained of pain while walking and performing other maneuvers.  (Id. at 431.)  Nonetheless, Dr. Carlton noted that Ray was able to walk more than 50 feet without a cane and exhibited a full painless range of motion in all of his joints.  (Id. at 431-32.)  Although he had some decrease in his range of motion in his lumbar spine and tenderness to palpation in his low back, there was no sign of cervical or lumbar nerve root compression or neuropathy.  (Id. at 432.)  Dr. Carlton opined that Ray is able to sit, stand, and walk more than 50 feet without a cane.  (Id. at 433.)

In July 2013 consulting physician Dr. Charles Wabner reviewed Ray's file at the administrative reconsideration level and provided an RFC assessment that largely echoed Dr. Gotanco's.  (Id. at 92-113.)  The only difference between the two opinions is that Dr. Wabner added an environmental limitation requiring Ray to avoid concentrated exposure to extreme cold and heat.  (Id. at 99.)  Dr. Wabner explained that he added those limitations to accommodate dizziness Ray was experiencing.  (Id.)  He further explained that he did not find evidence in the record to support Ray's allegation that his condition was worsening.  (Id.)

Ray renewed his treatment relationship with Dr. Medavaram in September 2013, and she filled out a chronic pain RFC assessment the same day.  (Id. at 439-

41, 723.)  Dr. Medavaram listed Ray's diagnoses as degenerative disc disease and a herniated disc resulting in low-back pain radiating to his lower extremity, based on a reduced range of motion, reflex and weight changes, abnormal posture and gait, and tenderness and muscle spasms.  (Id. at 439.)  Dr. Medavaram wrote that Ray's pain frequently interferes with his attention and concentration and that he suffers from depression and anxiety.  (Id.)  She also opined that Ray can walk only a half-block without rest or severe pain, sit for a total of 30 minutes at a time and stand for 45, and stand or walk for less than two hours in an eight-hour day.  (Id. at 400.)  Dr. Medavaram also wrote that Ray must walk every 30 minutes and needs a sit-stand option, must use a cane, and must be allowed unscheduled breaks of 15 to 30 minutes every two or three hours.  (Id.)  Additionally, she opined that Ray would be absent from work for more than four days per month.  (Id. at 441.)

The following year, in March 2014, Ray was hospitalized a second time for chest pain.  The emergency room notes reflect that Ray had a normal range of musculoskeletal motion.  (Id. at 525-26.)  The following month Ray started seeing a spine specialist Dr. Augusto Chavez for treatment of his back pain.  (Id. at 543.)  Ray told Dr. Chavez that his pain had increased a year ago, but the only treatment he had had in the previous year was from his primary physician, who prescribed him Tylenol-3.  Ray said neither Tylenol-3 nor morphine had helped his pain.  (Id.)  On examination Dr. Chavez noted that Ray walked with very short steps but did not favor either side and that he was capable of heel-toe walking.  (Id. at 549.)  Although Ray's trunk flexion was limited by pain and he had difficulty rising from

sitting because of pain, he was able to get on and off the exam table without assistance. (Id.) Dr. Chavez ordered a lumbar spine MRI which showed mild degenerative changes and mild narrowing of the left lateral recess abutting into the left S1 nerve root. (Id. at 470.) Dr. Chavez prescribed Norco for pain control, (id. at 550), but Ray stopped taking it after a few days because it made him sick, (id. at 541). After reviewing the MRI results, Dr. Chavez prescribed Mobic (meloxicam) and Tylenol-3, which he described as "conservative treatment." (Id. at 546.)

At the end of April 2014 Ray reported to Dr. Chavez that the medications were not helping much, and Dr. Chavez added Flexeril to his medication regime. (Id. at 548.) A few days after Dr. Chavez wrote that Ray walked with very short steps, Ray saw a cardiologist who reported his gait as being "normal." (Id. at 571.) He performed an angiography to ease Ray's intermittent claudication and counseled Ray on lifestyle changes. (Id. at 522.)

## B. Ray's Hearing Testimony

Ray testified at his hearing before the ALJ that his back pain is his main impediment to working. (A.R. 46.) He testified that he had been using muscle relaxers for three years and had upgraded from Tylenol-3 to 4 two or three months before the hearing in an effort to treat his pain. (Id. at 47-49.) He experiences medication side effects including feeling dazed. (Id. at 49.) Ray testified that he had tried three spinal injections but they made his pain worse. (Id. at 50.) He explained that after his April 2011 injury he tried to return to work, but would get in trouble for sitting down on the job to try to ease his pain, so he quit four months

later to avoid being fired.  (Id. at 51.)  Now his daily activities include listening to music and watching tv on good days, and staying in bed all day on bad days.  (Id. at 52.)

Ray testified that he is unable to work an eight-hour day because he needs to lie down for the majority of the day to relieve his back pain.  (Id. at 57.)  He testified that he has needed to use a cane for nine months and that he is unable to walk enough to return to his work as a security guard.  (Id at 53, 56.)  Specifically, he can only walk for a half block before the pain kicks in and he can only stand for 10 to 15 minutes at a time.  (Id. at 59-60.)  Ray also said that he is unable to sit for more than 15 to 20 minutes before having to get up and move around and that his pain makes it difficult for him to focus.  (Id. at 56-59.)  As for his peripheral arterial disease, Ray testified that this condition causes tightness in his calves from lack of blood flow.  (Id. at 59.)  Ray testified that the angiography he underwent in April 2014 to relieve this condition did not help relieve his pain.  (Id. at 59-60.)

## C.    The ALJ's Decision

On September 26, 2014, the ALJ issued a decision denying Ray's applications for DIB and SSI.  (A.R. 14-24.)  In engaging the required five-step process for evaluating disability claims, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), the ALJ found at steps one and two that Ray had not engaged in substantial gainful activity since his alleged onset date and that he has severe impairments in the form of peripheral artery disease, degenerative disc disease, coronary artery disease (status post-stent placement), and peripheral neuropathy.  (A.R. 16-17.)  After determining

at step three that none of Ray's impairments meet or equal any Listing either alone or in combination, the ALJ found that "the claimant has the [RFC] to perform light work . . . except that he can frequently climb ramps or stairs, stoop, kneel, crouch, or crawl; can occasionally climb ladders, ropes, or scaffolds; and would need to avoid concentrated exposure to workplace hazards, extreme cold, or extreme heat." (Id. at 17.)

In explaining this RFC determination, the ALJ characterized the medical record as revealing mostly "normal findings," (id. at 19), and pointed to those findings along with a treatment gap, conservative treatment, and Ray's activities of daily living to explain her conclusion that Ray's pain allegations were not fully credible, (id. at 20). The ALJ also explained that she gave the consulting physicians' opinions greater weight than those of Ray's treating physicians because she considered the former more consistent with the overall record evidence than the latter. (Id. at 20-21.)

Based on the assessed RFC, the ALJ determined at step four that Ray is unable to perform his past relevant work as a housekeeper, security guard, or merchant patroller, but at step five, she concluded that there are several jobs that exist in significant numbers in the national economy that Ray could perform. (Id. at 22.) Specifically, the ALJ relied on the vocational expert's hearing testimony that a person with Ray's RFC could work as a counter clerk, a sorter, or a shipping and routing clerk. (Id. at 23.) Accordingly, the ALJ concluded that Ray is not disabled

within the meaning of the Social Security Act and denied his applications for benefits. (Id. at 24.)

## Analysis

In his motion for summary judgment, Ray argues that the ALJ made several reversible errors by improperly weighing Dr. Medavaram's opinion, cherry-picking evidence relevant to the credibility of Ray's statements, and failing to seek updated medical records when she rendered her decision. This court's review of the ALJ's decision is "extremely limited," asking only whether the decision is free of legal error and supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (internal quotations and citations omitted). Because the court's role is neither to reweigh the evidence nor to substitute its own judgment for the ALJ's, if the ALJ's decision is adequately supported and explained it must be upheld even where "reasonable minds can differ over whether the applicant is disabled." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In order to adequately support the decision, the ALJ must build "an accurate and logical bridge from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (internal quotation omitted). Here, although there are aspects of the ALJ's decision that give the court pause, the government has shown that the decision meets the substantial-evidence threshold.

## A.    Dr. Medavaram's Opinions

Ray first argues that the ALJ violated the treating physician rule by discounting Dr. Medavaram's opinion that he is totally and permanently disabled without providing what Ray considers to be a "reasoned explanation" and by failing "to note how much weight" she assigned to Dr. Medavaram's opinions. (R. 19, Pl.'s Mem. at 7-8.) With respect to the latter argument, the ALJ did identify the level of weight she gave to both of Dr. Medavaram's opinions. She gave "no weight" to Dr. Medavaram's October 2012 opinion that Ray had only "partial capacity" to engage in a number of functions and gave "little weight" to her September 2013 chronic pain RFC assessment. (A.R. 21.) That leaves Ray's argument that the ALJ insufficiently explained her reasons for rejecting Dr. Medavaram's first opinion and discounting the second.

The treating physician rule set forth in the Social Security Administration's regulations instructs an ALJ to give controlling weight to a treating physician's opinion if it is well-supported by and consistent with the objective medical evidence and to analyze the opinion under a set of specific factors if it is not. *See* 20 C.F.R. §§ 404.1527 & 416.927; *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). Those factors include the length, frequency, nature, and extent of the treating relationship, the consistency between the opinion and the rest of the record, the doctor's specialty, and the opinion's supportability. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c). Here Ray does not argue that Dr. Medavaram's opinions are entitled to

controlling weight, but asserts that the ALJ failed to properly engage with the treating physician factors in discounting those opinions.

Although the court agrees with Ray that the ALJ could have done more to flesh out her explanation for the weight she assigned to Dr. Medavaram's opinions, read as a whole the ALJ's decision provides enough detail for the court to trace the logical bridge from her explanation to her conclusion. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (noting that a court properly reads ALJ decisions as a whole). With respect to Dr. Medavaram's 2012 opinion—that Ray was totally and permanently disabled by his back pain—the ALJ first explained that she gave that opinion no weight because Dr. Medavaram did not specify what she meant when she checked boxes describing Ray's abilities to walk, stand, and sit, among other activities, to be only "partial." (A.R. 21, 380.) That reason, which speaks to the supportability factor set forth in the regulations, is important because if by "partial" Dr. Medavaram meant to indicate that Ray could not sit, stand, or walk all day, but could do so for, say, six out of eight hours, that would weigh against her opinion that Ray is totally disabled. Next, the ALJ explained that she considered Dr. Medavaram's assignment of "extreme limitations" to be inconsistent with the rest of the record. (Id. at 21.) The ALJ accurately described that record as including MRI results showing moderate disc degeneration and only mild disc bulging and cited examination notes (from the same month Dr. Medavaram provided her opinion) documenting that Ray had a normal range of motion and strength in his musculoskeletal system. (Id. at 18-19, 392, 395, 407.) She also

pointed to records showing that Ray had a normal gait, (id. at 19, 734), as well as evidence that despite Dr. Medavaram's opinion that Ray has only a "partial capacity" for finger dexterity, examinations showed normal fine and gross motor skills and grip strength, (id. at 20, 380, 432). Finally, the ALJ explained that whether Ray is disabled is a question reserved to the Commissioner. (Id. at 21.) Although an ALJ may not ignore a treating physician's opinion regarding disability, the ALJ is not required to give any special significance to the treating physician's opinion that Ray is totally disabled. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *Bjornson v. Astrue*, 671 F.3d 640, 647-48 (7th Cir. 2012). Reading the ALJ's decision in its entirety, the court finds that she adequately engaged with the relevant factors in explaining her rejection of Dr. Medavaram's 2012 opinion.

Turning to Dr. Medavaram's September 2013 chronic pain RFC assessment, the ALJ explained that she gave that opinion "little weight" because she found the "extreme limitations" Dr. Medavaram described to be out of proportion to the medical evidence and the "fairly normal physical examination findings" it reflects. (A.R. 21.) That statement is supported by the record. Dr. Medavaram's opinion limited Ray to sitting only 30 minutes at a time (but needing to sit for 15-30 minutes at a time during rest breaks every two to three hours), needing to walk using a cane every 30 minutes (but to stand or walk less than two hours in an eight hour day), and being unable to walk more than a half block. (Id. at 440.) That opinion contrasts with the record evidence the ALJ catalogued showing that treating providers described Ray as having normal musculoskeletal strength and

range of motion, the consulting examiner's finding that Ray can sit and stand and walk more than 50 feet without a cane, (id. at 433), and observations from cardiologists that Ray walked with a normal gait, (id. at 571). Ray argues that the ALJ overlooked that "Dr. Medavaram's records consistently noted that Plaintiff's leg pain was interfering with his ability to stand and walk," (R. 19, Pl.'s Mem. at 7 (citing A.R. 341-79)), but this court's review of the 38 pages Ray cites in support of that assertion does not reveal any references to standing or walking difficulties,[3] (id. at 341-79).

In discounting the 2013 opinion, the ALJ also explained that she found Dr. Medavaram's opinion disproportionate to the "fairly conservative treatment" Ray received. (A.R. 21.) In fact, Ray's spine specialist himself described Ray's medication regime as "conservative treatment." (Id. at 546.) The ALJ also pointed to a gap in Ray's treatment, but because she failed to explore the possible reasons for that gap, including Ray's statement to the consulting examiner that he stopped seeking treatment when workers' compensation stopped paying for it, (id. at 430), that reason must be discarded, *see Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). Because the other reasons the ALJ gave for discounting Dr. Medavaram's opinion are sufficiently explained

---

[3] As noted above, Dr. Medavaram's handwritten notes are difficult to read, but the court has scrutinized them for references to standing and walking problems to no avail. The closest reference the court could find is from more than a year before Ray's alleged onset date when Dr. Medavaram wrote what looks like "c/o pain to the feet [illegible] walking." (A.R. 368.) That hardly demonstrates a consistent notation of walking trouble and Ray has not offered any translation of any of the progress notes, let alone any that support his assertion.

and supported, however, Ray has not shown that the ALJ committed any reversible error in analyzing Dr. Medavaram's opinions.

**B.    Treatment of Ray's Symptom Description**

Ray also argues that the ALJ's decision falls short of the substantial evidence standard because the ALJ improperly "cherry-picked" evidence to support her conclusion that Ray was exaggerating his symptoms while ignoring evidence that supported his symptom description.  (R. 19, Pl.'s Mem. at 8.)  The only example he points to in support of this argument is his assertion that the ALJ "failed to mention that the Plaintiff testified that he has to lie down during the day," while pointing to his statements that he can engage in light housecleaning and shopping. (Id.)  Although Ray is correct that an ALJ may not "cherry-pick" evidence that supports her conclusion while ignoring evidence that detracts from it, it is also true that an ALJ is not required to discuss every piece of evidence in the record.  *See Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013); *see also Shideler*, 688 F.3d at 312 (noting that the ALJ's failure to mention claimant's assertion of a need to lie down often is not reason to reverse because an ALJ is not required to specify which statements are not credible).  And in any event, the ALJ did not ignore Ray's testimony that he has to lie down; she explicitly referenced his testimony that he spends the majority of the day lying down.  (A.R. 18.)

To the extent Ray means to argue that the ALJ overemphasized his daily activities in concluding that his symptoms are not as severe as he alleges, the ALJ expressly noted that this was just one factor underlying her analysis, so there is no

reason to conclude that she equated his ability to prepare simple meals and perform light housecleaning with a capacity to work full time. *See, e.g., Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014) (noting that an ALJ properly considers daily activities in judging disability as long as she does not equate them with competitive employment). The ALJ explained that her analysis also rested on the fact that Ray testified regarding medication side effects that are not documented in the record, that his treatment was conservative, that he cares for his own personal needs, and that his statements were disproportionate to the objective medical evidence.[4] (A.R. 18, 20.) Given the special deference that this court is required to give to an ALJ's credibility determination, *see Bates*, 736 F.3d at 1098, Ray has not shown that the ALJ's treatment of his testimony is marred by reversible error.

## C.    Duty to Develop the Record

Finally, Ray argues that the court should reverse the ALJ's decision because the ALJ should not have relied on the opinions of consulting physicians from 2012 to render a decision regarding his disability in 2014 without calling a medical expert to testify at the hearing or sending an updated record to a physician for a new RFC evaluation. (R. 19, Pl.'s Mem. at 8-9.) Specifically, Ray asserts that at step three of her analysis the ALJ violated SSR 96-6p in failing to have a medical expert determine whether evidence of his peripheral arterial disease in combination

---

[4] The ALJ also references the treatment gap, but again, because she did not explore the reasons behind that gap, she should not have relied on it as a basis to discount Ray's testimony. *See Craft*, 539 F.3d at 679.

with his other impairments equaled a listing.[5] (Id.) But in his brief Ray does not identify any listing that his combination of impairments may have equaled, so there is no basis to find that the ALJ committed any error at step three. *See Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988) (noting that there is no need to get updated opinion on medical equivalency where there is no contradicting evidence on consulting physician's listings opinion).

To the extent Ray argues that the ALJ erred in relying on the consulting physicians' 2012 opinions in developing the RFC without getting an updated opinion based on 2014 evidence regarding his peripheral artery disease, this court must defer to the ALJ's decision regarding whether to seek updated medical opinions or to obtain testimony from a medical expert. *See Skarbek*, 390 F.3d at 504; *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993). That is because "[i]f an ALJ were required to update the record any time a claimant continued to receive treatment, a case might never end." *See Keys v. Berryhill*, __ Fed. Appx. __, 2017 WL 548989, at *3 (7th Cir. Feb. 9, 2017). Although an ALJ has a responsibility to solicit additional evaluations where she thinks the evidence is insufficient to make a determination, *see Bates*, 736 F.3d at 1101, the fact that "reasonable minds can differ" over how much evidence is enough in a given situation is not sufficient to trigger a remand, *Kendrick*, 998 F.2d at 457. The ALJ is not required to take the

---

[5] SSR 96-6p was rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* https://www.ssa.gov/OP_Home/rulings/di/01/SSR2017-02-di-01.html, (last visited April 19, 2017).

duty to make a "complete record" literally. *See Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004).

Here, despite being represented by an attorney at his hearing, Ray never asked the ALJ to send updated records to the consulting physicians or to otherwise obtain an updated expert opinion, suggesting that he had "decided that another expert opinion would not help" his cause. *Buckhanon ex rel. J.H.*, 368 Fed. Appx. 674, 679 (7th Cir. 2010). In any event, to the extent Ray argues that the 2014 evidence pertaining to his peripheral arterial disease would have changed the consulting physicians' assessment, the cardiology notes that are contemporaneous with the angiography notes state that although Ray reported calf aches after walking a half block, he reported no muscle weakness, no back pain, and no exercise intolerance, and he exhibited a normal gait. (A.R. 570-71.) Accordingly, it is unclear that these records would have altered the consulting physicians' opinions in any way. *See Keys* 2017 WL 548989, at *3 (finding no error in ALJ's decision not to send consulting physicians updated records where claimant "did not explain how the findings on those reports undermine" their opinions). The court therefore concludes that Ray has not shown any prejudice from the failure to obtain additional opinions or that the ALJ otherwise failed in her duty to develop a full and complete record.

As a final note, Ray has not presented any arguments with respect to an evidentiary issue that arose at his hearing regarding an outlier in Dr. Chavez's treatment notes. Namely, there are notes reflecting that Ray saw Dr. Chavez on

May 7, 2014, and reported that his pain had improved and that he planned to return to work as a truck driver after being off work for two months. According to those notes, Ray reported that the Flexeril, Tylenol-3, and Meloxicam were helping. (Id. at 547.) At the hearing, the ALJ pointed out that Ray's Social Security records showed a new hire report from February 2014 for a truck driver position through a contracting company located in Arizona. (Id. at 38-39, 219.) Ray said that he had not been hired for any job in 2014 and that Dr. Chavez's May 2014 report must have been for a different patient. (Id. at 38-39.) The ALJ counseled Ray that if the new hire report on his earnings record was inaccurate, he "might want to contact the Social Security field office." (Id. at 39.) The ALJ referenced Dr. Chavez's May 2014 treatment note in cataloguing the medical evidence, but it does not appear from her decision that she gave the notes any special weight, perhaps because of the confusion regarding their reliability. (Id. at 19.) The ALJ alluded to that confusion in her decision. (Id.) But because Ray does not refer to this record issue, Dr. Chavez's May 2014 treatment notes, or the new hire report, and does not raise any arguments pertaining to this controversy, the court finds no basis to conclude that it detracts from the substantial evidence otherwise supporting the ALJ's decision.

## Conclusion

There can be no doubt from the record that Ray has suffered from some level of chronic back pain since his 2011 injury. But because the ALJ pointed to substantial evidence adequately supporting her conclusion that his pain is not

disabling, this court is bound to affirm that decision.  Accordingly, Ray's motion for summary judgment is denied and the government's is granted.

**ENTER:**

_____

**Young B. Kim**
**United States Magistrate Judge**